**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

FILED

MAR 0 5 2007

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY CLERK

| | |
|---|---|
| J.M. b/n/f JENNIFER FRIEND AND CRIAG MAISIN, | § § § |
| Plaintiffs | § § |
| v. | § § |
| LAKE TRAVIS INDEPENDENT SCHOOL DISTRICT | § § § |
| Defendant | § § |

A07CA 152SS

CIVIL ACTION NO.:

_____

## PLAINTIFF'S ORIGINAL COMPLAINT

**NOW COMES** J.M. b/n/f  Jennifer Friend ("mother") and Craig Masin ("father"), collectively termed Plaintiff herein, by and through their attorneys of record Martin J. Cirkiel, Cirkiel & Associates, P.C. and Yvonnilda Muniz, Attorney & Counselor at law, complaining of and about Lake Travis Independent School District ("LTISD") Defendant herein, asserting causes of action for violations of the Individuals with Disabilities Education Act ("IDEA") and Section 504 of the Rehabilitation Act of 1973 ("Rehab Act"); and related rules, state law and administrative code provisions promulgated thereunder.  In support thereof Plaintiff would respectfully show the following:

### I. JURISDICTION AND VENUE

1.       J.M. brought his original claim against LTISD before a Texas Education Agency ("TEA") Hearing Officer alleging violations of IDEA, 20 U.S.C. § 1415(i)(2)(A) and the federal and state laws and regulations issued thereunder.  This Court has jurisdiction to address erroneous decisions made by a Texas Education Agency Hearing Officer pursuant to 20 U.S.C. § 1415(i)(3)(A) and 19

1

Texas Administrative Code ("T.A.C.") § 89.1185(p).   The Court also has jurisdiction to award attorneys fees and costs to the Plaintiff pursuant to 20 U.S.C. § 1415(i)(3)(B).

2.      In addition and in the alternative, this Court has jurisdiction over Plaintiff's claims pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehab Act"), including federal regulations issued thereunder.  The Court also has jurisdiction under these causes of action to award attorneys fees and costs to the Plaintiff pursuant to 42 U.S.C. § 2000d et seq.

3.      Venue properly lies in the Western District of Texas pursuant to the general venue statute, 28 U.S.C. § 1391(b).

## II. ADMINISTRATIVE EXHAUSTION

4.      In general before a party may bring a claim in federal or state court pursuant to IDEA, a party must first exhaust administrative remedies, U.S.C. §1415(1) and 19 T.A.C. § 89.1185(p). Plaintiff has met that burden.

## III. THE PARTIES

5.      Plaintiff J.M. is a minor and resides with his natural parents, Jennifer Friend and Craig Masin, within the Lake Travis Independent School District in Travis County, Texas. J.M. is eligible to receive public education services from Defendant, Lake Travis Independent School District, a public school district in the State of Texas.

6.      Defendant Lake Travis Independent School District, is a public school district in the State of Texas.   It receives federal funding and is thereby required to follow the requisites of the Rehab Act noted above.  LTISD has previously been represented at the administrative stage by and through its attorney of record, Ms. Susan B. Graham, from the law firm of Walsh, Anderson, Brown, Schulze & Aldridge, P.C., 6300 La Calma Ste. 200, Austin, Texas  78752, and Plaintiff reasonably expects

Ms. Graham to represent Defendant in this cause, or in the alternative, that an attorney from said law firm will represent the Defendant in this cause.

## IV. NATURE OF THE ACTION AND RELIEF SOUGHT

7.      IDEA requires schools to provide a free, appropriate public education ("FAPE") to children with a disability have the need for special education and related services, commensurate with the child's unique needs, 20 U.S.C §1400(d)(1). These requirements are both substantive and procedural. A procedural violation may warrant a finding that the school has failed to provide FAPE when it causes a loss of educational opportunity, as is alleged by Plaintiff in this cause. In addition, Plaintiff also argues substantive violations of IDEA.

8.      J.M. is a child with a disability. His parents reasonably believed that he was eligible for special education services. Defendant LTISD had their staff complete what is called a full independent evaluation, to determine whether or not young J.M. was eligible for special education services. Professional staff of Defendant "LTISD" determined J.M. was not eligible for services. The parents of J.M. disagreed with this decision. On June 2, 2006, J.M. with his parents "as next friends" filed a complaint with the Texas Education Agency ("TEA"), arguing that LTISD's failure to make him eligible for special education services deprived him of certain rights and services pursuant to IDEA.[1]

9.      The Texas Education Agency ("TEA") appointed the Honorable Brenda Rudd, a State of Texas Special Education Hearing Officer, to hear this cause. She heard arguments and received

---

[1].  Since that time Plaintiff has learned that the evaluation provided by Defendant was not neutral nor independent but was rather a sham. In fact, while Defendant went through the motions of performing an independent evaluation in truth the outcome was predetermined due to Defendant's discrimination against children with the disability of autism and pre-disposition to exclude such children from special education services.

evidence from October 18, 2006 through October 20, 2006, in what is known as a Due Process Hearing.[2] On December 5, 2006 she issued her decision (attached as "Exhibit A" and incorporated herein as if fully set forth) with related findings of fact and conclusions of law.  In that opinion, the Hearing Officer determined that J.M. was not eligible for special education services and that by extension LTISD did not violate any of the rights of J.M. Plaintiff disagrees and appeals the Hearing Officer's decision accordingly and asks this Court, among other things, to find him eligible for special education services, that LTISD be required to provide services to J.M. commensurate with his unique individualized needs and other relief more specifically described below.

10.     In addition and in the alternative, the acts and omissions of LTISD discriminate against Plaintiff due to his disability and violate Section 504 of the Rehabilitation Act of 1973 thereby.

## V. <u>STANDARD OF REVIEW</u>

11.     The standard of review is *de novo*, <u>Samuel Tyler W. v. Northwest Indep</u>. Sch. Dist., 202 F. Supp. 2d 557, 559.

## VI. <u>LTISD DISCRIMINATES AGAINST CHILDREN WITH AUTISM</u>

12.     Pamela Carroll is the Special Education Director at Defendant LTISD.  She and other professional educators at LTISD participated in a training program on autism, the kind of autism which has afflicted J.M. But this wasn't the usual professional training on a subject of much concern that we would expect from professional educators, rather it was a skit that mocked the specific type of autism that has afflicted J.M., denigrated children (like J.M.) who are diagnosed with this terrible

---

[2]. A Due Process hearing is the principal IDEA vehicle to challenge and resolve special education disputes. The Hearing is an administrative proceeding that resembles a trial. School districts and parents present witnesses, evidence, and arguments to support their positions. An impartial hearing officer decides each issue and orders corrective action, as needed.

illness and insulted the parents of children (like Craig Masin and Jennifer Friend) who advocate on behalf of their child. have this disease. In addition, during this training, Carroll and other LTISD personnel learned how to communicate with each other using non-verbal cues during meetings with parents which undermines the collaboration Congress requires between parents and school personnel (attached as "Exhibit B" and incorporated herein as if fully set forth).

13.    Plaintiff is reasonably certain that believes Defendant LTISD, Carroll and others violated federal law by using federal funds to pay for this discriminatory training about autism, a training that reinforced stereotypes and was both discriminatory on its face and as applied to J.M. and by extension to his parents.

14.    Such prejudice and animus pervades the acts and omissions of Defendant, as more specifically set forth below.

### VII. LTISD DESTROYED J.M.'S EDUCATIONAL RECORDS

15.    In addition, during the administrative procedure before the Texas Education Agency Hearing Officer, LTISD staff testified that various professional personnel destroyed J.M.'s educational records that were developed during the child find, screening and evaluation process. Such destruction of records also violate IDEA.

### VIII. FACTUAL BACKGROUND

16.    J.M. (now five years old) was born on August 27, 2001. He had a difficult time as an infant, crying for hours every night and during the day could not tolerate being still. He was very sensitive to sound and seemed to be almost constantly overwhelmed. At six (6) months old, J.M. had two (2) unexplained seizures. At some point between eleven (11) and fifteen (15) months old, J.M.'s parents

noticed that he began to change by actively avoiding eye contact with others and by having unexplained screaming episodes lasting sometimes up to thirty (30) minutes. During these periods he could not be calmed, nor could he imitate others or play peek-a-boo, like he could prior to the seizures.

17.     When J.M. was about 17 months old he began reacting very differently around other young children, expressing fear and would run away from others when he was approached. His mother enrolled him in a Kindermusik class for toddlers in an effort to get him used to peers in a structured setting. Unfortunately, rather than moving away from other children when they were nearby he would often hit these children for no apparent reason. At this time he also began to exhibit perseverating behavior, by compulsively lining up his toy cars in the same order.

18.     Because of these behaviors and other reasons that became obvious to J.M.'s parents during his early development, they started him speech therapy. During this period the therapist also worked on J.M.'s stilted play, particularly the lining up cars over and over. The therapist also attempted to teach J.M. how to better imitate others, how to play more appropriately with toys and how to tolerate a slight changes in play routines. All this and more was done in an effort to lay the foundation for sharing enjoyment in playing with another child. Unfortunately, these interventions were of minimal benefit.

19.     In order to address J.M.'s diminished social development his parents also attempted other activities. For instance, J.M. was put into a music class for almost two (2) years, made sure J.M. had weekly play dates with the same two children each time and took him to the playground almost daily. Nevertheless, these efforts, like the interventions noted above provided almost no decrease in his stilted social behavior. In addition, the perseverating behavior became more intense. While J.M.'s

intelligence waxed, for example he could recite scripts verbatim from his favorite television program, Thomas the Tank Engine, his socialization skills waned.

20.     The parents of J.M. observed that their son exhibited a great deal of sensory-defensiveness particularly to touch and sound.  They subsequently learned that this defensiveness actually resulted in a "fight or flight" response, evidenced by J.M. hitting other children or running away.  He could not function without supervision in any day care situation and in a busy classroom.  In fact, even with supervision J.M. will often quickly run from activity to activity in the classroom, will hit other children or run out of the classroom or even the school building in a panic.

21.     After J.M.'s parents learned more about Sensory Integration Dysfunction and how much sensory difficulties interfere with a child's social and emotional development, they became very, very concerned.  They decided to contact their local school district in hopes of enrolling J.M. in the Preschool Programs for Children with Disabilities ("PPCD").

22.     In late March or early April 2005, Mother spoke to a woman in the Special Education Department of LTISD, believed to be Pamela Carroll (now the Director of Special Education services for LTISD).  Mother explained her son's language delay, severe problems with social interaction with other children including hitting them, his autistic tendencies and as the family later learned, a Sensory Integration Dysfunction.[3]  Notwithstanding all this information Mrs. Friend was told that her son was not sound severe enough to qualify for services.  Little did she know that this would not be the only time that Defendant LTISD's predisposition against children with autism

---

[3].  Sensory Integration Dysfunction is a neurological disorder in which the brain doesn't receive and interpret sensory information correctly. When the brain is unable to interpret information correctly the child receives inaccurate messages all day long telling him that he is not safe.

would rear its ugly head.

23.     In June 2005 J.M.'s parents took J.M. to Dr. Ezam Ghodsi, pediatric neurologist. Dr. Ghodsi reviewed J.M.'s history and examined J.M.  Dr. Ghodsi diagnosed J.M. with neurological dysfunction, speech delay, articulation difficulty, central auditory processing difficulties, sensory integration disorder, and Asperger's[4] tendencies (an autism spectrum disorder).  He noted problems with impulsive and aggressive behavior, emotional overreation, obsessive-compulsive tendencies, and monitored J.M. for ADHD.  Dr. Ghodsi recommended counseling and play therapy with a psychologist to try to reduce J.M.'s aggressive and impulsive behaviors,  improve his listening and ability to follow directions, and help bring J.M.'s anxiety level down.

24.     In September 2005, J.M. began attending preschool in the 4-year-old class at Westlake United Methodist Preschool,  a National Association for the Education of Young Children ("NAEYC") accredited program that focuses on social and emotional development, as opposed to primarily cognitive development. Ms. Aldaya, J.M.'s teacher at Westlake, characterized J.M.. as having "meltdowns," which she described as "genuine panic" with "tears and fright and scared and shaking and unable to pull himself out of it.  He could not get himself out of it." During these meltdowns, J.M.  fled class in a panic and lay in the hallway, screaming.  He could not comprehend lining up and instead walked around the room without focusing or interacting.  J.M. was unable to interact socially with peers and presented more like a 3 year old than the 4 ands a half year old he was. J.M. also had problems processing noise and hitting others. Ms. Aldaya reported that J.M. required constant one-to-one support from his teacher or mother.  J.M. did not come close to

---

[4] Asperger's Disorder is the term for a specific type of pervasive developmental disorder which is characterized by problems in development of social skills and behavior.

mastering any of the Texas Essential Elements for Pre-kindergarten.

25.     One day, on or about September 20th, the class had gone to "chapel" where all the children would normally sit together and sing. J.M. became so overwhelmed by the noise level and proximity to other children that he was unable to remain in chapel with the others, and went into the hallway where he was later found lying on the floor and screaming uncontrollably. Ms. Aldaya tried many skilled interventions in order to reach out to him and calm him down but all to no avail. J.M. continued to be completely irrational and unresponsive until it finally dissipated. After this incident at school, J.M. was unable to separate from his mother for even a brief time, even at home. He continued to follow her around all day and would not leave her side even for a short time. J.M. was so traumatized that he was unable to attend the nursery school for several weeks after this occurrence.

26.     In October J.M. was referred to and began seeing Dr. Alice Lottes, PhD. She observed J.M. approximately nine times over a lengthy period of time. Dr. Lottes administered the Gilliam Asperger's Rating Scale, finding PDD-NOS (an autism spectrum disorder) with separation anxiety. She also used the Behavior Assessment Scale for Children-2 ("BASC-2) and identified clinically significant anxiety, hyperactivity, atypicality, adaptability, and attention problems. In addition, Lottes noted that J.M. failed to participate in group activities and that he quickly became overstimulated by sensory input and disintegrates. On one occasion, Dr. Lottes observed J.M. experiencing, what she described as "panic and severe disintegration." She concluded that his "deficit social skills, restricted patterns of behavior and cognitive patterns will prevent him from making adequate progress in the regular curriculum." Lottes developed a plan to help J.M. gradually separate from his mother and return to school. By November, J.M. was able to leave the house and attend

school for only about two (2) days a week but then only with his mother with him all the time. Dr. Lottes also investigated pre-school pervasive disability child training programs in the area and determined the Capitol School of Austin which specializes in children with autism and language disorders, could be be best for J.M.

27.   On November 11th Mother re-contacted LTISD for the second time and requested that her son be evaluated for special education services. She spoke with Jack Modgling, now the LTISD Special Education Coordinator and scheduled an appointment for January 20th. LTISD sent out an information packet from the school containing a consent for evaluation form, various other forms and instructions to return all completed forms to LTISD on the date of the appointment.[5] Neither Mr. Modgling nor the information packet informed Mother that J.M was scheduled for a screening[6] and not an evaluation as requested or expected. In the form provided Mother wrote that J.M. avoids crowds, touch, unfamiliar children, peers and that his doctor and psychologist support a Pervasive Developmental Disorder ("PPD")[7] diagnosis based on sensory input and auditory processing.

28.   Separate and apart from her request that LTISD evaluate her son, Mother followed the advice of Dr. Lottes and initiated the application process at the Capitol School which required a three (3) day observation period for J.M.   After speaking to J.M.'s preschool teacher, Ms. Aldaya, and

---

[5]. Mother later rescheduled the childfind screening appointment for February 17th because she and J.M. were in the middle of the Capitol School enrollment process and wanted to finish that before doing the testing with the district.

[6]. In this context a screening is a mechanism that acts as a gatekeeper. It is a relatively brief and inexpensive mechanism for the staff to determine that a child does not meet eligibility standards. It forecloses the necessity for an extensive and much more costly full evaluation.

[7] Pervasive Developmental Disorder, Not Otherwise Specified is a 'subthreshold' condition in which some - but not all - features of autism or another explicitly identified.

learning about his difficulties in pre-school, the director would not even let J.M. go through the school's initial observation process without first going through behavior therapy with the school's behavior specialist. J.M. completed four (4) therapy sessions and by mid January the three (3) day observation was scheduled.

29.     Unfortunately during this observation period J.M. demonstrated the very same difficulties during this observation period as he did in his preschool.   The director of this special school for autistic children even gave J.M. an extra day to show improvement, but he did not.  The Capitol School refused to admit J.M. for admission.  Mother asked the school to put him on a waiting list but school officials refused noting that J.M. required more one-on-one support than they would normally provide.  In addition, there were concerns the behavioral issues were related to J.M.'s neurological deficits and not necessary or merely behavioral.  Mother asked if that if her son continued with more behavior therapy, could they attempt admission again.  The director refused. Mother then offered to send and pay for a full-time shadow to attend school with J.M. so as to satisfy the  school's supervisory concerns but they declined.   The admission committee did suggest that Mother contact a skilled pediatric behavior specialist, a Mr. Ray Condon, so he could implement a social skills program called a Relationship Development Intervention ("RDI").

30.     In December 2005,  J.M. had his six (6) month check up with his pediatric neurologist, Dr. Ghodsi.  Dr. Ghodsi noted J.M.'s neurologic dysfunction and speech delay with apraxia,  difficulty with central auditory processing, Sensory Integration Disorder, Asperger's tendencies, obsessive-compulsive tendencies, anxiety, impulsive and aggressive behavior, emotional overreaction, and possible vocal tics. Dr. Ghodsi stated that  he was monitoring J.M. for ADHD, and advised the parent "to start J.M. in counseling and play therapy hoping it would reduce his impulsive,

aggressive behavior and improve his listening and following through on instructions, and also to some extent reduce his anxiety. He recommended that Dr. Lottes evaluate J.M. for Asperger's, an autism spectrum disorder. He also encouraged Mother to investigate her local PPCD program and be sure to observe the classroom to see the level of functioning of the students.

31.    Sometime in January, Dr. Lottes observed J.M. in his preschool environment. She noted that J.M. continued to difficulty functioning in the classroom environment and that he was still not able to sit with other children during group time. When there was a break for group play time in gym class, rather than immediately join the activity like other children, it took J.M. over five (5) minutes just to join the group and when he finally did, it was only for a small amount of time. He participated in an activity for only a few minutes and then laid down on the floor for the remainder of the class. Dr. Lottes noted that even in familiar settings J.M. had difficulty maintaining interaction or engagement for long and would consistently withdraw from other children.

32.    On February 17th, J.M. was finally seen by the by the LTISD Child Find Assessment Team. On the morning of the testing Mother gave Jack Modgling, all of the paperwork he had requested that she fill out, along with her completed consent and a recent speech evaluation, an Occupational Therapy evaluation, the neurological report from Dr. Ghodsi and Lottes' evaluation and report. J.M. specifically told Modgling that Lottes' report was completed after he had completed the intake interview in November, so this would be new information for the group to consider. Importantly, Mother specifically asked Mogdling how the assessment team would be evaluating J.M.'s social interactions with other children and his behavioral needs during the evaluation. Modgling responded that the team would assess these issues through observation. Modgling never informed Mother that her son would be receiving a mere screening and not the full evaluation, as she had requested, the

forms had noted and that she expected.

33.     J.M. did not have any trouble separating from his mother at the beginning the testing. He was allowed to carry a big train around with him. The testing lasted for approximately an hour and a half and at a certain point J.M. was brought to the waiting room and was quickly dropped off.  J.M. immediately came over to his mother, clung to her and said loudly, " Go home. Momma, go home!" Mother asked what was wrong J.M. stated that someone had taken away the train. Then J.M. removed himself from the situation by lying down on the floor.

34.     Sometime thereafter Mother contacted Ray Condon, a behavior consultant recommended by the director of the Capitol School.  Mr. Condon agreed to begin the lengthy assessment process involved in beginning the RDI program.

35.     On February 27th Mother learned that J.M. was denied services. The cumulative summary report provided by LTISD did not address the diagnostic issues raised by Lottes and Ghosdi.  Nor did it address one of the main reasons that J.M. was being screened, his inability to interact normally with other children.  Nor did the report state that J.M. was provided any of the tests listed on the consent form signed by mother. Mrs. Friend was shocked. That LTISD knew J.M. had been diagnosed with Autism, had received medical and psychological interventions for severe behavior and social problems, as well as mother's specific concerns noted on the form LTISD had asked her to fill out, yet this screening had determined he was not severe enough to receive a full evaluation to determine eligibility for Special Education services.  Mother could not understand how LTISD could come to such a conclusion when they failed to observe J.M.'s social interactions and behaviors with other children in a play environment or in the classroom. Mother was also flabbergasted that the LTISD report form did not mention the obvious noncompliant behavior when J.M. lied down on

the floor.[8]

36.     Mrs. Friend called Jack Modgling to voice her disagreement with the Child Find Assessment Team's determination that J.M. did not require further testing.  Mother told Mr. Modgling that Autism Spectrum Disorders involve difficulty with social interaction and behavior issues and that these areas were not even considered during this screening process. Mother then asked Mogdling if the team had considered Dr. Lottes's report and diagnosis.  Mr. Modgling said that the Assessment Team had considered Dr. Lotte's report, but that J.M. presented age-appropriately.  Mother persisted and  asked if the Assessment Team had read the report of Dr. Lottes's observation in the preschool which showed J.M.'s difficulties with interaction and behavior in school.  Mr. Modgling said he could not say if it had actually been read.  Mother asked for a meeting with school personnel, called an ARD Coomitte meeting.[9]  Mother asked for the name of Mr. Modgling's supervisor and he directed her to Pamela Carroll.

37.     On March 2nd Mother delivered a letter to Ms. Carroll, requesting that the full independent evaluation for her son be completed, that the reports she had provided be included and considered during the evaluation; that Mother be allowed to review the results of the evaluations and that LTISD include her and her husband in the ARD Committee meeting when discussing and determining J.M.'s eligibility for special education and related services.

38.     Mother called J.M.'s behavior specialist Ray Condon to ask if he would be willing to go with

---

[8].  Of course, Mrs. Friend and Mr. Masin could not have known then, what they know now, that the despicable training provided to and by Pamela Carroll, made it a foregone conclusion that their son would never be accepted for services.

[9].  An ARD is an Admission, Review, & Dismissal committee meeting.  The ARD committee is responsible for making the educational decisions for a student.  An ARD is needed for initial placement or any time the school staff or parents feel a change is needed in a student's special education program.

her to the meeting with Ms. Carroll.  Mother hoped that Ray would be able to give LTISD more

information about J.M.'s severe difficulties interacting with other children.  Mr. Condon agreed to

go with Mother to the meeting and asked Mother to let Ms. Carroll know ahead of time that he

would be coming since she and Ray had both worked together at AISD in the past and he didn't want

to surprise her when he walked in.  Before the meeting Mother left a message with Ms. Carroll that

Mr. Condon would be attending the meeting.

39.     In early March, Mother spoke to the Ms. Sharon Coleman, director of J.M.'s preschool.

Mother explained to Ms. Coleman that LTISD had concluded during the child find screening that

J.M. presented age-appropriately and did not plan to do a full evaluation.  Ms. Coleman volunteered

to call Ms. Carroll to express her knowledge about J.M. and invited Ms. Carroll to come see J.M.

in the preschool.  A few days later, Ms. Coleman told Mother that she had spoken with Ms. Carroll

but that she felt that Ms. Carroll was not at all helpful.  In fact Ms. Carroll never came to the

preschool.

40.     On March 7th J.M.'s preschool teacher, Ms. Charlie Aldaya, wrote a letter to LTISD

describing J.M.'s difficulties in the pre-school and his educational and behavioral needs. She reported

that J.M. needed someone with him at all times and was not functioning well in the classroom. He

was unable to participate in tabletop projects and group activities and circle time with the other

children. She also reported that if he can sit next to her with a fidget toy and receive ongoing

reminders from her he could very occasionally participate in story time.  She reported that he had

experienced some growth in social development because instead of hitting his peers rather he would

watching them.

41.     On March 20th J.F., C.M. and Mr. Condon met with Ms. Carroll who stated that LTISD

would observe J.M. at school and at home (they never did). Carroll also strongly encouraged J.M.'s parents to visit the Lake Travis program for children with developmental disabilities so they would see that the students there were more severe and largely nonverbal. Mother interpreted this comment to mean that J.M. was too high functioning for LTISD's program. Mother stated that she was concerned about J.M.'s auditory processing difficulties as mentioned in Dr. Ghodsi's report. Ms. Carroll immediately stated that LTISD would then also offer to test J.M.'s expressive and receptive language during the evaluation. Ms. Carroll asked Mother to sign a consent to request or release confidential information for J.M.'s preschool and she did. Ms. Carroll stated that next Mother and C.M. needed to meet with the Licensed Specialist in School Psychology ("LSSP") to sign the other consent form to start the evaluation process.

42.     Ms. Ann Haefner, the LSSP, was not able to schedule a meeting with Mother until about March 24th. Mother signed the same exact consent form she had signed prior to the childfind testing, though it was used for an evaluation and not a screening. Mother also told Ms. Haefner that J.M. reported difficulty with a teacher[10] during the childfind testing and that there was no mention of this incident or his behavior in the Childfind Summary Report. Mother asked Ms. Haefner to look into this and Ms. Haefner agreed. Ms. Haefner gave Mother the names of the tests that would be administered and some checklists and rating scales for Mother and J.M.'s teacher to fill out. Mother returned her forms to LTISD within a few days.

43.     On April 18th, LTISD administered the PEP-3 assessment.[11] J.M. got through first hour or

---

[10] J.M. told his mother that one of the teachers had not been nice to him during the screening because she took his train away (the one he had been carrying during the evaluation as a security object).

[11] The PEP-3 assesses the developmental level of young children with autism, who may be non-verbal, have limited attention skills and poor concentration, and who are not used to a formal testing situation.

so of testing with Ms. Sheri Hewett, speech pathologist. However, Mother had to remain in the room during testing. Not surprisingly J.M. did very well in this segment. He was very cooperative and according to all, enjoyed the one-on-one attention with an adult. At one point he looked to all the women to see if they had noticed his work. These were all very typical interactions between J.M. and engaged adults, particularly since it was in a quiet environment with lots of new toys and no children around to distract him. It like a therapy session. He did well with the seat work and responded well to the structure, which was to do an activity quickly, put it in the bin, and then do a fun activity.

44.     However, when the structure changed from the seat work routine to unstructured time, which consisted of jumping on one foot and playing catch, J.M. showed definite signs of overstimulation. He became silly and lost focus but hung on. Then it was time to switch teachers and do more seat work. J.M. approached his mother and asked to go home. Mother managed to get J.M. to the table with new teacher, Gail Simmons, the Occupational Therapy Diagnostician, but he was overwhelmed. Again he asked to go home. Mother then had to sit with him at the table. He tried to comply but could not focus. Ms. Denton gave him a noisy toy to keep him at the table. She spoke sternly to him to sit down and told him he would get the toy back after he did the work. When he touched the toy again she scolded him, saying that he didn't ask permission to touch it. J.M. briefly followed directions to color or trace something on paper, but again mother was present.

45.     At one point, the speech teacher, Ms. Sheri Hewitt, tickled J.M. J.M. is very tactile defensive and gets frightened by tickling, however, he attempted to tolerate the tickling. Ms. Hewitt tickled J.M. again and he started to get more nervous. Mother informed Ms. Hewitt that J.M. interprets tickling as threatening. Hewitt responded that she needed to see his reactions. As he had done during

the screening J.M. began to lie on the trampoline, lie on the floor, lie on his mother's lap and the finally headed for the door. J.M. remained by the door, and Mother and the diagnosticians agreed to end the testing for that day. Ms. Denton began to stroke J.M.'s hair and J.M. did not like it. Mother informed J.M. that it was ok to tell people not to touch him, but by then J.M. had shut down and was totally unresponsive.

46.     On April 20th LTISD attempted to observe J.M. in a classroom setting and with peers for the very first and only time with other children present. Assessors Ann Haefner, LSSP, and Gail Simmons, diagnostician, went to the Westlake United Methodist Preschool with the task to observe J.M. with children, in the classroom. In addition, they were to interview his teacher, Ms. Charlie Aldaya. That day J.M. struggled with his mother when entering the classroom but finally he did. Mother sat in a hallway out of sight and started talked to Ms. Haefner and Ms. Simmons when she Ms. Aldaya excitedly come out of the classroom, asking if they had seen J.M. Mother too became frightened and ran outside to make sure her son was not wandering around the parking lot. Finally, mother found her son in another building, running around with a panicked look 0n his face, eyes were huge, running very quickly, and in a daze. Mother brought her son back to the classroom and as had happened during the evaluation period at the school, had to remain with her son, so that he could be observed in a classroom.

47.     When it was time for a group activity J.M. stayed behind the group of students for most of the group circle time but watched and did not participate. In fact, he sat alone fidgeting with a slinky. When Ms. Aldaya invited J.M. to participate with the group, and with mother nearby, he did. This first observation period lasted about 15 - 20 minutes. Thereafter it was free play time in the gym. J.M. went to the gym alone for 4-5 minutes and pretended to be a train and then came to find his

mother. After she went into the gym J.M. rode on a scooter board for about 10 minutes in his particular perseverating matter, by reciting the Thomas the Tank Engine video scripts verbatim. Ms. Haefner asked Mother if this was typical behavior. Mother responded that it was typical behavior for J.M. She told Ms. Haefner and Ms. Simmons that J.M. usually spends most of his free play time in the gym perseverating by himself instead of interacting with peers.

48.     A few days later, J.M.'s teacher, Ms. Aldaya, completed the Gilliam Autism Rating Scale and Autism Checklist, which mother hand delivered to LTISD.

49.     On May 3rd J.M. returned to LTISD for the rest of the PEP-3 assessment. J.M. was very nervous and scared to separate from his mother and did so only after coaxing from an older student. During this period Mother completed a parent interview with Ms. Simmons and Ms. Denton who informed them about her son's developmental history, various responses to therapies, Sensory Integration Disorder, high level of anxiety, rigidity and insistence on routines that seem to serve no purpose and diagnosis of autism.

50.     A few days later J.M. attended the final day of testing with the speech pathologist Sheri Hewett. Another speech pathologist named Ms. Deborah Crowder was also in the room for the whole assessment, but Ms. Hewett administered all of the testing herself. She administered both the Preschool Language Scale and the Goldman-Fristoe Test of Articulation[12], both tests J.M. had already taken. A few times during the testing it was obvious to Mother that J.M. already knew what was going to be asked of him (as he has an amazing memory). Ms. Hewett stated that the evaluation

---

[12] The Goldman-Fristoe Test of Articulation provides information about a child's articulation ability by sampling both spontaneous and imitative sound production. Examinees respond to picture plates and verbal cues from the examiner with single-word answers that demonstrate common speech sounds.

team thought J.M. was much too social to be autistic.

51.    Mother was surprised that LTISD did not use a specific test to evaluate J.M.'s auditory difficulties as his private speech pathologist at KidVentures had done.   Mother had expressed her concern about J.M.'s auditory processing difficulties to Ms. Carroll in their meeting on March 20, 2006, and Ms. Carroll had agreed to assess this area. Mother also expressed her concerns regarding J.M.'s auditory processing difficulties to Ms. Hewett and the rest of the team after the parent interview in April.

52.    On May 5th Mother was asked to sign another consent for an additional assessment.  Ms. Haefner, asked that Ms. Aldaya and Mother fill out the BASC-2 rating scale.  On the consent form Ms. Haefner wrote that additional information was needed in order to determine educational needs.  A few days later mother hand-delivered to LTISD the BASC-2 rating scales that she and Ms. Aldaya had completed.

53.    On or about May 11th mother asked to meet Dr. Bryan Jepson M.D. to discuss whether or not J.M. was truly autistic.  Dr. Jepson is a pediatrician at the Thoughtful House, a group of M.D.s who only treat children with autism or related disorders.  J.M. had been under Dr. Jepson's care since January 2006.  Mother informed Dr. Jepson that LTISD had evaluated J.M. and that they felt that he were saying that he was too social to be autistic.  Mother asked Dr. Jepson if being social and being autistic were mutually exclusive.  Dr. Jepson answered no. He stated that it is a common misconception that autistic people cannot be social.  He then went through the DSM-IV diagnostic criteria for autism with Mother  Dr. Jepson asked Mother for concrete examples of J.M.'s behaviors and characteristics as they related to each criteria.  Dr. Jepson determined that J.M. met 8 of the 12 criteria for autism.  He said that the diagnosis of PDD-NOS is given to people who have atypical

presentation or do not meet enough criteria but still have autistic behaviors. Dr. Jepson further related that while J.M. actually met more of the standards for PDD-NOS, J.M.'s diagnosis was that of High-Functioning Autism. Finally, Dr. Jepson clarified that while J.M. does present atypically with regard to his social desires, he is indeed autistic.

54.    A few days after Ms. Haefner called Mother and asked  for clarification on what had happened during the evaluation period at the Capitol School.  Mother explained  that J.M. went through four (4) behavior therapy sessions followed by a four (4) day observation at the Capitol School.  Mother informed Ms. Haefner that J.M. was not accepted because he could not function independently enough and that they had noted significant sensory issues that affected his behavior. LTISD never subpoenaed these particularly relevant records.

55.    On May 15th Mother faxed Dr. Jepson's written diagnosis of high functioning autism with atypical presentation to Ms. Haefner.  Mother then left a voice message for Ms. Haefner, informing her of the fax and also repeating her request to visit the school's specialty PPCD program.

56.    On the next day, Mother asked Ms. Haefner if they could have an ARD Committee meeting instead of an informal feedback session.  Ms. Haefner stated that it was best practice to have a feedback session which was scheduled for the 24th.  May 18th was J.M.'s last day of the spring semester at Westlake United Methodist Preschool.  A few days later  Mother received a call from Sharon Halloron, the specialty class PPCD teacher at LTISD who invited Mother to come visit the classroom early the next morning before the parent feedback session, which se did.

57.    On that day Mrs. Friend and J.M.'s behavior therapist, Mr. Ray Condon, attended the parent feedback session. Condon hoped to speak to the group to provide insight into J.M.'s struggles. The so called "feedback session" did not seem to be geared toward feedback at all, rather LTISD

assessment team members read their part of the document. Amazingly, none of the reports mentioned that the only time LTISD observed J.M. at school and around other children, he frantically ran away from class and refused to play with any other children. That instead of interacting normally with other children he separated himself and exhibited classic autistic behaviors by perseverating by and to himself. In fact, there was no break between sections for mother's comments or questions. Ray Condon finally found the opportunity to go over his assessment of J.M.'s problematic behaviors and social skills deficits. The team listened and then asked Mother to sign a consent form so they could contact Mr. Condon directly and she agreed.

58.    The team stated that J.M. did not present as a student with autism. They proceeded to state that J.M.'s social difficulties instead appeared to be the result of J.M.'s difficulty separating from his mother. Mother was humiliated and felt ashamed. She could not speak and defend herself because she did not want to cry in front of everyone.

59.    The team further discussed their recommendations for separating at preschool and parent/preschool communications. The team then added that they were recommending kindergarten. Mother was completely shocked and blurted out, "In the fall?" They all said yes. This was the first time anyone on the team had talked about kindergarten. Even the FIE recommendations were about preschool. Everyone knew that J.M. had not been successful in preschool that year and that PPCD was being considered throughout the evaluation process. Yet they told Mother to register J.M. for kindergarten, without Special Education or other supports. Mother informed the Team that she had serious reservations about kindergarten in the fall but that she would follow their instructions and register for school. That afternoon, Mother left three (3) phone messages for Ms. Haefner with concerns about the FIE. Ms. Haefner did not call back.

60.     Little did mother know that the evaluation was really a sham, a foregone conclusion that J.F.

wold not be accepted into special education services, due to the training Pam Carroll had received

denigrating the type of autism afflicting J.M..  In addition, it is no surprise that there was no open

communication or discussion between the school personnel and J.M.'s mother, except for the trained

non-verbal communications going on between LTISD personnel.

61.     On the evening of May 24th Mother wrote a detailed letter regarding her concerns about the

FIE. She listed a significant amount  of crucial information that she had provided to LTISD which

had been omitted from the FIE.  For example[13], LTISD's description of the speech evaluation

completed on March 24th, did not note that the results of this evaluation showed deficits in skills that

relate to success in school in such as the pre-reading skills of discriminating between sounds,

identifying and generating rhymes, remembering words and sentences, difficulty with reasoning in

language, difficulty discriminating between sounds and holding new words and sentences in memory

which suggests that he may have difficulty following directions and understanding new vocabulary

introduced in the classroom or that  J.M.'s auditory perceptual skills decrease when there is external

visual and/or auditory noise present in his environment.  LTISD also omitted important information

from Ms. Aldaya's letter which showed how J.M.'s behavior impeded his ability to learn and must

be addressed for him to succeed in a school environment and Dr. Jepson's observation that J.M.

presents atypically, but is indeed autistic.   Mother also stated that because of the significant

omission of information she felt that a full evaluation had not yet been completed within the 60-day

---

[13] The following examples are meant to illustrate some of the issues Mother addressed in her letter.
However, Mother listed many more examples of information the LTISD omitted, which would be too voluminous to
restate in this complaint.

time line.  Mother faxed this letter to Ms. Haefner and Ms. Carroll.

62.    On May 30th Ms. Haefner responded verbally to J.F.'s letter. Ms. Haefner again repeated the two-prong process that LTISD used to determine whether a child qualifies as a student with a disability: is there a disability and does it interfere with progress in school.  Ms. Haefner also stated that the fact that J.M. was not successful in preschool did not mean that he needed Special Education Services now because J.M. did not have the benefit of LTISD's strategies the upcoming year, that J.M. could go through regular education first and then if needed, he could go into Special Education, that LTISD wanted to try their recommendations and strategies first, LTISD did not use a formula or numerical weighting process to reach their conclusions, LTISD would just attach J.F.'s letter on back of their FIE instead of including the omitted information, LTISD would not record for Mother the subtests and standard scores for the evaluations they administered but they agreed to let Mother come in and copy down all the results by hand.

63.    On June 1st Mother and Mr. Condon went to Lake Travis Elementary School to copy down the test results.  Mother asked Ms. Haefner why she could not just photocopy the scores and not the test questions which would be just like the information she had received in the past from J.M.'s speech pathologists and his psychologist.  Ms. Haefner stated that the protocols were confidential.  Mother asked Mr. Condon if he had heard of this before and he responded that he had not.  Ms. Haefner became defensive.

64.    Mother then asked Ms. Haefner to go over the computer report from J.F.'s BASC-2 responses and explain why her results had to be used with caution. Ms. Haefner showed Mother where LTISD had circled only three items that showed inconsistency.  First, question eighteen (18) asked if J.M. was restless when traveling in the car.  Mother responded "Sometimes."  Second, question sixty five

(65) asked if J.M. was restless during movies. Mother responded "Sometimes." Finally, question eighty four (84) asked if J.M. was overly active. Mother responded "Almost Always." Ms. Haefner explained that LTISD thought that these answers should all have been the same. Mother was instantly able to explain her answers. J.M.'s behavior depends on the particular situation he is in. Mother was trying to answer the questions as completely and honestly ass possible. For example, J.M. is almost always overly active. However, he is only restless in the car when he goes on very long trips out of town or when he are in heavy traffic and the car is not moving. During normal car rides J.M. is very content because the movement of the car has always calmed him. Ms. Haefner did not reply to J.F.'s explanation.

65.     Mr. Condon asked Ms. Haefner how the Special Education Team reconciled the fact that their determination that J.M. was not autistic or in need of educational services contradicted the diagnosis and observations provided by outside evaluators. Ms. Haefner was not able to answer that question. Mother and Mr. Condon thanked her and left.

66.     On June 2, 2006 Mother and C.M. filed a complaint and Request For Due Process to the Texas Education Agency ("TEA").

67.     On June 5th Mother received a call from Vicky Vernon, Counselor for Lake Pointe Elementary. She stated that she and the principal were open to the idea of J.M. possibly attending Kindergarten for just short periods of time. He would be able to start out during very structured times and slowly increase. She commented that maybe by the end of the school year he would be up to half days Ms. Vernon stated that she would wait until after school started so she could check out the makeup of the Kindergarten classes and choose best fit for J.M.

68.     On June 29th J.M. had his regular checkup with  Dr. Ghodsi. Dr. Ghodsi reviewed the

previous six months of therapy reports and preschool teacher's reports. Mother also provided him

with the evaluation data she had copied down from LTISD's assessment. Dr. Ghodsi was surprised

to hear that J.M. was not going to qualify for Special Education services. He and Mother discussed

what would be appropriate to provide for J.M. so he could be successful in the fall.

69.     Dr. Ghodsi wrote a letter to LTISD, outlining his recommendations. He stated J.M. would

benefit from attending Pre-Kindergarten with typically developing children. He also stated that J.M.

would benefit from a full time aide -on-one aide to facilitate his participation in circle time,

cooperative learning groups, completion of tabletop class work, and independent learning centers.

Dr. Ghodsi noted that J.M. needs frequent reminders to help him stay focused and to monitor his

sensory threshold and facilitate frequent sensory breaks as needed before he becomes over stimulated

so J.M. could control the level of stimulation and/or obtain proprioceptive and vestibular input as

needed. Dr. Ghodsi also stated that due to auditory processing difficulties J.M. needed to frequently

be told that someone just addressed him and needed help clarifying what a peer or teacher has just

said to him and that J.M. needed frequent repetition even in one on one interactions in quiet

environments. Dr. Ghodsi also stated that LTISD would need to facilitate J.M.'s behavior

improvement plan, provide social skills instruction/coaching throughout the day, keep J.M. sage

when he gets into "fight or flight" mode and either runs out of the building or hits another child ,

assist with transitions and help him cope with changes in routine, staff, or placement of objects in

the environment so he can remain in the classroom. Finally, Dr. Ghodsi stated that J.M. would

benefit from one to one behavior modification therapy, social skills instruction and coaching in

school, at home and in community, speech therapy (2 one-hour sessions weekly), psychological

therapy to reduce anxiety and teach coping strategies, an FM amplification system, auditory

discrimination/processing therapies, and a neuropsychological evaluation.

70.     In July 2006, Mother took J.M. to Central Texas Autism Center for a functional behavior analysis as well as any other expertise they had to share.  On the first day of assessment, Darcy Hamre, Assistant Director, assessed J.M. for three hours. Ms. Hamre met with Mother and stated that J.M.'s differences were apparent to her but might be less obvious to people with less experience with autism.   She noticed holes in his social interaction skills, language skills, and ability to read nonverbal cues and emotions. On the second day, Ms. Hamre and Ms. Kelle Wood both assessed J.M. together for three more hours. After the assessment was complete, J.M. and Mother went back for an additional parent training session.

71.     Ms. Hamre drafted a report detailing J.M.'s  behavioral problems, language deficits, social interaction difficulties, and his inability to read nonverbal cues.  The report noted that J.M. was a fun, bright child whose maladaptive behaviors are impeding his ability to succeed in a classroom setting. She also reported that J.M. initially presents as a child that has fluent communication skills, but that after spending more time with J.M., she was able to observe some gaps in his communication skills.  These areas for improvement need to be addressed in a one-on-one setting with high rates of reinforcement. The report also noted that J.M. had difficulty labeling the emotions of others, he could label basic emotions such as happy and sad, but needed prompting for more advanced emotions, he needed prompting to label the nonverbal cues on others such as a turned down mouth or crossed arm.  Ms. Hamre  recommended that these emotions/nonverbal cues be taught throughout J.M.'s day in his natural environment. The Central Texas Autism Center provided an IEP with 24 recommended goals.

72.     On August 10th Ms. Vernon called Mother and stated that LTISD had given J.M.'s situation

more thought and wanted to place him with a more experienced teacher than Ms. H.  Ms. Vernon stated that she wanted to schedule a home visit (she never did).  She did also invite J.M. up to the school the next day.  Mother told Ms. Vernon that she would think about it and call her back.  When Mother called Ms. Vernon back, she told her that she was not planning to send J.M. to Kindergarten without an aide and that J.M.'s therapists were in agreement about this.  Mother also told Ms. Vernon that she did not want to close any doors but that she also didn't want to waste Mrs. O'Keefe's time. Mother and Ms. Vernon decided to schedule a time for J.M. to meet the teacher and check out the room the following day at 11:00 am.

73.     On August 11th Mother and J.M. went to Lake Pointe Elementary to meet Mrs. O'Keefe.  The staff was at an off-site meeting when they arrived so Mother and J.M. waited in Ms. O'Keefe classroom.  J.M. was very interested in new surroundings.  While they were waiting, Ms. Carroll walked into the room.  Mother  told Ms. Carroll that she was not expecting to see her and that she had not been told that she was coming to observe J.M.  However, Ms. Carroll sat down and made it clear that she was not leaving.  Mother told Ms. Carroll that she did not think that she was just stopping in, that she had not consented to having J.M. observed yet again without a peer in sight, and that she thought it was inappropriate that Ms. Carroll did not  tell Mother she was coming to watch J.M. in the classroom in the midst of a Due Process dispute.  Ms. Carroll stated  that she was not leaving and was going to stay in the classroom and wait for the teacher while J.M. played.  Mother informed Ms. Carroll that if that were the case, she and J.M would be leaving.

74.     Mother and J.M. did in fact leave the classroom. In the hallway it was very chaotic as the teachers were all returning from the meeting and some were moving boxes up and down the halls. J.M. immediately became panicked due to the noise and movement.  He started pulling J.F's arm,

signaling his desire to leave the building. Mother and J.M. saw Mrs. O'Keefe in the hallway. Ms. O'Keefe tried to speak with J.M. but he was escalating quickly and began yelling that he wanted to leave the building. Mother attempted to talk to Ms. O'Keefe, but J.M. began screaming louder and attempted to climb up onto Mother Mother began to feel very emotional. She was upset by what she felt was an ambush by Ms. Carroll, and because J.M. was now having a negative experience in the school, something that Mother want to try very hard to avoid.

75.     Ms. O'Keefe could tell that Mother was struggling and suggested that she meet Mother at the front foyer of the building where it was quieter. Mother and J.M. proceeded to the foyer. A few moments later, Mrs. O'Keefe came in and she asked J.M. to help her by opening the door for her. He calmed enough to listen to her but didn't comply. Then the principal Ms. Guddelman walked past and saw J.M. struggling. She said that she saw someone she wanted to meet and then approached J.M.. She got down on the floor and spoke kindly to him. J.M. responded to her immediately. J.M. agreed to go back to the classroom, but only if the Ms. Guddelman would go too.

76.     Back in the classroom, Mother told the women that she did not want to waste their time but she also did not want to close any doors. She told them that J.M. was not at all successful in preschool this year and she did not believe it made sense to jump ahead to Kindergarten without the preschool skills necessary. Mother also told them that she knew it was not good for J.M. to put him into Kindergarten, especially without an aide. J.F., Ms. O'Keefe and Ms. Guddelman discussed the possibility of putting J.M. in the 5-year-old class at the UT Lab School with a full time shadow and letting J.M. come to the Kindergarten classroom on Fridays for an hour or so to give him that exposure. Mrs. O'Keefe felt that situation would be very difficult for J.M. and Ms. Guddelman thought their might also be legal issues with that situation. Mother agreed with Mrs. O'Keefe that

auditing Kindergarten probably was not a good idea.

77.     On August 23rd an ARD was held for J.M.  Mother began by discussing the two newest documents she had to share.  Importantly, J.M.'s teacher Ms. Aldaya was never invited to the meeting.  In anyc ase, the first document presented was Ms. Aldaya's input regarding educational need, and second was the diagnosis of Auditory Processing Disorder by audiologist as recommended by Dr. Nussbaum.  The ARD Committee had not received a copy of the diagnoses by Dr. Nussbaum, so Mother read the report to them.  Mother then began to discuss Ms. Aldaya's letter but she was interrupted by Gail Denton who stated that Ms. Aldaya's report was negative and that LTISD did not talk about what a child can not do.  After that discussion degenerated the Committee discovered that some of the documents that Mother sent over during the document production process apparently did not get passed on to LTISD by their attorney.  Mother presented the missing documents to the Committee, which included D. Ghodsi's letter of June 29, 2006, Westlake United Methodist Preschool Spring Conference Report, Speech Therapy notes from Lara Davidson of KidVentures, Occupational Therapy daily progress notes from Jen Thomas of KidVentures, Central Texas Autism Center IEP recommendations, Central Texas Autism Center Language Skills Assessment Recommendations, Central Texas Autism Center Individual Treatment Plan, Behavior consultation report from Mr. Condon, RDA planning form, and a Relationship Development questionnaire completed by Mr. Condon

78.     Instead of calling another ARD to give them time to read all of the information presented, the Committee took brief recess of approximately ten (10) minutes, and reconvened the ARD.  The Committee stated that they still considered their own FIE appropriate and that the reports just produced "jelled" with their own FIE.  Based upon Carroll's training on autism it should be no

surprise that this session too was not an open discussion (which is intended by Congress in IDEA) about the various evaluations regarding J.M. but was rather a close-minded and one-sided presentation of LTISD's position.

79.    Upon professional advice, J.M. was enrolled at the "Priscilla Pond Flawn Child & Family Laboratory at UT-Austin," the back-up plan if LTISD did not work out.  LTISD received notice of this enrollment on August 28th.  During this period J.M. turned five years old.  He is in pre-kindergarten with 18 other children and a one-to-one aide.  His teacher and a Professor at the University of Texas, Mrs. Sandy Dillon, observed that J.M. did not initially connect with her and expressed a "panicked" look when first entering class.  She reports that he hs obvious language delays, overreacts to noise and is easily overwhelmed.  J.M. can't tolerate the regular schedule so he arrives at 10:00am and is very ritualized upon entry to the classroom, always playing with blocks first.  Dillon notes that if J.M. is left alone he can't control his body and will push and force himself into others.  It is only with the provision of one-to-one services with his "shadow" and receiving behavioral therapies with his counselor, Mr. Ray Condon, that he even capable to attend school. J.M. requires help to get through the door, needs to lean on someone physically or else he will not remain focused.  In fact, he can only focus on lunch for barely a few minutes.  J.M. will often kick any child who gets near him unless his shadow intercedes.    Dillon reports that when J.M. gets terrified, he explodes and acts like a caged animal.  He requires physical restraint on a number of occasions and responds better in a quieter more controlled environment and that unless his shadow was around, J.M. would definitely not be able to attend the school.  Dillon also reports J.M has never initiated an interaction with another child and generally sits at the back of the room alone.  In fact, most interactions between J.M. and others are adult instigated and notes that he is socially more like

a three year old than a five year old.  In addition, he can't write his name or do paper and pencil tasks, things even a normal three year old can do.  Professor Dillon believes that J.M. needs a transition plan in order to succeed in public school that would include a one-to-one aide.

80.    On October 18th through October 20, 2006, the Due Processing Hearing was held and all the above-referenced evidence was received (except related to Carroll's obnoxious training denigrating children with autism, which was unknown to the Hearing Officer).  At the end of the hearing, the Hearing Officer ordered the parties to complete post hearing briefs, pursuant to 19 T.A.C. § 1185(k). In addition, Judge Rudd noted that the parents had argued, among many things, that J.M. had numerous behavioral problems and would not interact with other children normally in the educational environment and that the LTISD evaluation process failed to observe him with other children, in a number of environments, so that their report lacked credibility.   Judge Rudd specifically asked the parties to brief and find caselaw on the issue as to what were the number of times a school must evaluate such a child like J.M., in order for the evaluation to be reliable. Plaintiff did brief such request, while Defendant LTISD did not.

81.    Nevertheless and on December 5, the Hearing Officer issued a decision noting, among other things, that LTISD was not required to admit J.M. to special education services.

82.    Due to the acts and omissions of LTISD, the blatant discrimination against children with autism, and now with the incorrect decision of the Hearing Officer ratifying LTISD's discriminatory behaviors, Mother and Father believed their child could never be served correctly by LTISD and were constructively forced to move to another school district where their child's autism diagnosis is not denigrated but rather respected and served as such.

### VIII. THE HEARING OFFICER'S DECISION IS INCORRECT

83.     Plaintiff incorporates by reference, as if fully set forth herein, all the above-referenced paragraphs.

84.     The Hearing Officer erred when she omitted and misrepresented certain facts making her findings of fact incorrect and in addition, did not apply the correct legal standards in this cause, making many of her conclusions at law, likewise incorrect.

A.      FACTUAL MISREPRESENTATIONS AND OMISSIONS

85.     In Finding of Fact ("FOF") number four (4), the Hearing Officer related her interpretation of J.M.'s medical history as an infant.  She omitted that J.M. had 2 seizures at 6 months and subsequently lost the ability to imitate and could not point.  These omissions are significant in that facts omitted are indicative of autism.

86.     In FOF number seven (7), the Hearing Officer related J.M.'s visits with his neurologist. However, she only noted the positive conclusions made by the doctor, those indicating improvement in J.M. She omitted the doctor's observation of obsessive-compulsive tendencies, anxiety, impulsive and aggressive behavior, emotional overreaction, and possible vocal tics. She also omitted that Ghodsi said he was monitoring for ADHD, and advised parent "to start JM in counseling and play therapy hoping it would reduce his impulsive, aggressive behavior and improve his listening and following through on instructions, and also to some extent reduce his anxiety."

87.     In FOF number ten (10), the Hearing Officer described J.M.'s experience at Westlake private school.  She greatly misrepresented the facts of J.M.'s experience at the school.  For example, she states that J.M. had separation issues after being poked by a family member, but omitted the fact that J.M. subsequently has a complete meltdown at the school and that J.M. had to see a doctor several

times in order to reintegrate into school.

88. In FOF number twenty six (26), the Hearing Officer described J.M.'s behavior during the PEP3 test. She omitted the fact that J.M.'s mother had to remain in the room to secure JM's participation. She also omitted that after 35 minutes J.M could no longer tolerate the testing. As his behavior disintegrated, he lay on a trampoline, then on mother's lap and finally on the floor by the door. This behavior and J.F.'s presence were also omitted from the FIE produced by LTISD.

89. In FOF number twenty eight (28), the Hearing Officer notes that according to the results of the CARS test, J.M. fell into the non-autistic category. She omitted from this conclusion the fact that LTISD completed the CARS test based solely on their forty (40) minute observation of J.M. at Werstlake. Since the LTISD's observations of J.M. omitted crucial information regarding J.M.'s autistic behaviors such as perseveration, inability to relate to peers, communication deficits, and high anxiety, it is not surprising that the CARS results were in the non-autistic category. See ¶ 38, supra The Hearing Officer also omitted the results of the BASC2 which showed clinically significant anxiety, hyperactivity, atypicality and withdrawn behavior (96th - 99th percentile) and at-risk attention problems (95th percentile); Sensory Profile which reflected significant sensory integration deficits.

90. In FOF number thirty four (34), the Hearing Officer stated that when the ARD committee met on August 8, 2006, J.M. was not attending school so he had no current teacher. See ¶ 53, supra. This statement is incorrect, as J.M. attended Westlake during the spring of 2006 and had a teacher, Ms. Aldaya. Further, a child's regular teacher is required to be at the ARD and the failure compromises the development of an appropriate plan for a child as it can't consider the child's individual needs. Ms. Aldaya knew J.M.'s individual needs on a day-to-day basis better than anyone and should have

been included.  At the ARDs of August 8th and August 23rd the school failed to invite Aldaya.

91.    In addition, and also absent from FOF number 34, was the fact that Ms. Aldaya continued

to teach J.M. over the summer.  The Hearing Officer's conclusion that J.M. had no teacher has the

affect of relieving LTISD of liability for their failure to invite J.M.'s teacher to the ARD, which they

are required to do pursuant to IDEA.

92.    In addition to omitting LTISD's failure to invite Ms. Aldaya to J.M.'s ARD, the Hearnig

Officer also omitted Ms. Aldaya's letter, of August 16, 2006, to LTISD, in which she reported that

J.M. had not mastered the Texas Essential Elements for Pre-K, had only completed two (2) projects

all year, was unable to interact or carry on a conversation with his peers, and ran out of his classroom

in a panic.  She also stated that J.M. needed an aide to help him read his peers' nonverbal cues,

interact with peers, help him focus on tasks, stay in his seat, and help him when he became panicked

or uncooperative.  The ARD committee discussed the letter during the ARD of August 23, 2006, but

only to comment that Ms. Aldaya was being negative.

93.    In FOF number thirty six (36), the Hearing Officer stated that the parents attended the ARD

of August 8 and August 12, but she omitted that the parent provided notice on August 28th that J.M.

would attend the "Priscilla Pond Flawn Child & Family Laboratory at UT-Austin," beginning Sept.

5, 2006.

94.    In FOF number thirty eight (38), the Hearing Officer stated that LTISD offered a transition

plan, but omitted that the transition plan offered did not provide for a 1:1 aide.

95.    In FOF number forty three (43), the Hearing Officer stated that J.M.'s aid reported

"significant progress" as of October 5, 2006.  This statement completely misrepresents the actual

statement of the aid.  The full statement by the aid is "While J.M. has made significant progress, he

still needs substantial support in initiating and maintaining interactions." The aid also stated that "when no adult actively engages him in an activity with peers, J.M. has not made much progress."

96.     The Hearing Officer completely omitted LTISD's observation of J.M. at Westlake.  During this 40-minute observation J.M. ran out of the school building in a "fight-or-flight" panic and could not be located for a few minutes. His mother found him in another building and brought him back to class.  She had to remain in the room to secure J.M.'s participation for the observation.  This incident was omitted from the district's FIE. J.M. sat alone and did not enter the group for the circle activity. When the class went to the gym J.M. played alone, pretending to be a train, perseverating and reciting Thomas the Tank Engine video scripts verbatim.  The District LSSP asked if this was typical and Mother responded that J.M. spends much time perseverating by himself.  This stereotypical behavior was also omitted from the FIE. During this 40-minute evaluation, the district staff never saw J.M. speak with peers/teachers or play with a peer. Yet he was never observed with children again.

97.     The Hearing Officer also completely omitted Dr. Lottes' behavioral findings and recommendations.  Dr. Lottes observed J.M. about nine times over a lengthy period, noting he failed to participate in group activities and would lie down. She noted how quickly J.M. becomes overstimulated by sensory input and disintegrates, and also witnessed one incidence of "panic and severe disintegration". She also used the Behavior Assessment Scale for Children-2 and identified clinically significant anxiety, hyperactivity, atypicality, adaptability, and attention problems. She concluded that his "deficit social skills, restricted patterns of behavior and cognitive patterns will prevent him from making adequate progress in the regular curriculum."

B.     ERRORS IN THE CONCLUSIONS AT LAW

98.     Plaintiff incorporates by reference, as if fully set forth herein, all the above-referenced paragraphs.

99.     The Hearing Officer was incorrect as a matter of law, pursuant to <u>Cypress-Fairbanks Independent School District v. Michael F.</u>, 118 F3d 245 (5th Cir.) cert. denied, 522 U.S. 407 (1998) when she listed the following Conclusions of Law ("COL") or alternatively failed to address the below-referenced legal concerns:

100.    "The District gave due weight and consideration to private assessments and evaluations," Conclusion of Law (hereinafter "COL") number 6.

101.    "Petitioner did not meet his burden of proof in his allegation that the District failed to effectively gather information regarding Petitioner's developmental history," COL number 7.

102.    "Petitioner did not meet his burden that the District failed to collaborate with private assessors and evaluators," COL number 8.

103.    "Petitioner did not meet burden that the District failed to observe Petitioner with peers prior to making a determination of ineligibility at the screening," COL number 9.

104.    "Petitioner did not meet his burden that the District failed to observe Petitioner with peers on more than one occasion prior to making a determination of ineligibility at the evaluation stage," COL number 10.

105.    "The Petitioner did not give undue weight to Petitioner's cognitive abilities," COL number 11.

106.    "Petitioner did not meet his burden than the District failed to provide correct weight to Petitioner's social inadequacies," COL number 12.

107.    "The District obtained informed consent relative to the screening," COL number 13.

108.    "Petitioner failed to meet his burden of proof that the District failed to consider private assessments and evaluations in a timely manner prior to the initial screening," COL number 14.

109.    "The District obtained informed consent relative to the evaluation," COL number 16.

110.    "Petitioner failed to meet his burden of proof that the District failed to effectively distinguish between a screening and an evaluation on the consent form and as applied to the Petitioner's parents," COL number 17.

111.    "Petitioner failed to meet his burden of proof that the District failed to offer or provide sufficient structure in a classroom setting for Petitioner to receive educational benefit," COL number 20.

112.    "Petitioner failed to meet his burden of proof that the District failed to offer or provide any specific and/or individualized programming that would address Petitioner's behaviors," COL number 21.

113.    "Petitioner failed to meet his burden of proof that the District failed to invite Petitioner's current teacher to the ARD," COL number 23.

114.    "Petitioner failed to meet his burden of proof that, as applied to Petitioner, the District failed to sufficiently individualize the screening process to adequately assess and evaluate his academic and non-academic needs," COL number 24.

115.    "Petitioner failed to meet his burden of proof that, as applied to Petitioner, the District failed to sufficiently individualize the evaluation form," COL number 25

116.    "Petitioner failed to meet his burden of proof that the District failed to find Petitioner eligible for special education and related services under the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA04")," COL number 27.

117.    "The District did not deny Petitioner a free, appropriate public education," COL number 28.

118.    In addition the Hearing Officer incorrectly ruled that the "Full Individualized Evaluation" provided J.M., satisfied professional standards when it did not.

119.    In addition the Hearing Officer incorrectly ruled that the various procedural violations of LTISD did not rise to level of failing to provide J.M. an educational opportunity, a substantive violation of IDEA.

120.    In addition the Hearing Officer incorrectly gave deference to LTISD personnel who had only observed J.M. with other children on one occasion as compared to his treating professionals who had see him on a multitude of occasions, a violation of substantive law.

121.    In addition the Hearing Officer incorrectly failed to note the fact that LTISD failed to address all areas of J.M.'s disability, a violation of substantive law.

122.    In addition at the hearing the Hearing Officer incorrectly ruled that Plaintiff's request for an Individualized Educational Evaluation was untimely.

123.    In addition Plaintiff brought forth evidence that LTISD had destroyed educational information in violation of federal and state law, such information that Plaintiff had asked for in discovery and was never provided. Plaintiff asked that the evaluation completed by LTISD, reliant upon such destroyed records, be stricken from the record and in the alternative, be given no weight. The Hearing Officer refused to do so and erred thereby.

## IX. CAUSES OF ACTION

124.    Plaintiff incorporates by reference, as if fully set forth herein, all the above-referenced paragraphs.

## A.   VIOLATIONS OF THE INDIVIDUALS WITH DISABILITIES EDUCATION

IMPROVEMENT ACT 2004

125.    The IDEA and its implementing regulations require that each state, including its political

subdivisions such as local school districts, who receive payments under the IDEA must ensure that

all students with disabilities are provided a *free appropriate public education* also known as FAPE.

FAPE is defined as a program of "special education and related services . . . which are provided in

conformity with the individualized education program." 20 U.S.C. § 1401(8).  To the degree that a

policy or practice inhibits honest consideration of the child's unique educational needs, the school

fails to provide FAPE and thus violates the IDEA. Plaintiff asserts that LTISD has violated J.M.'s

rights to FAPE.

126.    LTISD's acts, omissions and practices, as set out in detail herein, have all, when taken

together or separately, contributed to violating his rights pursuant to the IDEA and federal

regulations promulgated pursuant thereto, the Texas Education Code and the rules promulgated by

the State Board of Education.

B.    **VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT OF 1973**

127.    At all times relevant to this Complaint, J.M. was an individual with a disability within the

meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794.  Also during this period,

LTISD received federal funding, thus making itself responsive to the requisites of this act.  LTISD

has discriminated against J.M. and by extension his family, in violation of the Rehabilitation Act by

refusing to serve him in the same or similar manner as non-disabled children, as set out in detail

herein.

## X. <u>PRAYER</u>

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that this Court receive the

records of the administrative proceedings and additional evidence as requested by Plaintiff and issue and order granting the following relief:

a.    permit additional discovery in issues related to Section 504 of the Rehabilitation Act of 1973;

b.    permit additional discovery in issues related to destruction of educational records;

c.    permit supplemental discovery in issues related to IDEA;

d    reverse the decision of the hearing officer in whole or in part;

e.    render a decision that J.M.'s rights were violated pursuant to  IDEA;

f.    provide Plaintiff compensatory relief for violations of FAPE, including but not limited an expert in assessing educational need;

g.    render a decision that J.M.'s rights were violated pursuant to Section 504 of the Rehabilitation Act of 1973 ;

h.    that J.M. be given damages commensurate with violations of Section 504 of the Rehabilitation Act of 1973;

i    provide attorney's fees and costs for Plaintiff from the onset of this cause in the administrative forum; and

j.    all other and further relief to which the Court finds the Plaintiff is justly entitled.

Respectfully submitted,
Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas  78664
(512) 244-6658
(512) 244-6014 [Fax]

By: _____

Mr. Martin J. Cirkiel, Esq.

State Bar No.: 00783829

Ms. Yvonnilda Muniz, Esq.
Law Offices Of Yvonnilda Muniz
Post Office Box 92018
Austin, Texas 78709
(512) 288-4279
(512) 535-1264 [Fax]

**Attorneys For Plaintiff**

RECEIVED

MAR 5 2007

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

**JS 44** (Rev. 11/04)   **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a)   PLAINTIFFS**

J.M. b/n/f Jennifer Friend and Craig Maisin

**DEFENDANTS**

Lake Travis Independant School District

**(b)** County of Residence of First Listed Plaintiff   TRAVIS
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   TRAVIS
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

A07CA 152SS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☐ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
20 U.S.C. 1400 et seq. (IDEA)

Brief description of cause:
Appeal of administrative "due process" hearing.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE  3/5/07

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

DUPLICATE                    405274

AO82
(Rev. 4/90)

**RECEIPT FOR PAYMENT**
**UNITED STATES DISTRICT COURT**
**for the**
**WESTERN DISTRICT OF TEXAS**
at _Austin_

RECEIVED FROM   _Daniel Garza_
_1416 Suffolk_
_Austin, TX 78723_

| Fund | | ACCOUNT | AMOUNT |
|---|---|---|---|
| 6855XX | Deposit Funds | 086400 | 60 00 |
| 604700 | Registry Funds | 510000 | 190 00 |
| | General and Special Funds | 086400 | 100 00 |
| 508800 | Immigration Fees | | |
| 085000 | Attorney Admission Fees | TOTAL | 350.00 |
| 086900 | Filing Fees | | |
| 322340 | Sale of Publications | Case Number or Other Reference |
| 322350 | Copy Fees | 1.07·CV·152 |
| 322360 | Miscellaneous Fees | |
| 143500 | Interest | |
| 322380 | Recoveries of Court Costs | New Case |
| 322386 | Restitution to U.S. Government | |
| 121000 | Conscience Fund | J.M. b/h/f Jennifer |
| 129900 | Gifts | Friend and Craig |
| 504100 | Crime Victims Fund | |
| 613300 | Unclaimed Monies | Maisin V. |
| 510000 | Civil Filing Fee (½) | |
| 510100 | Registry Fee | Lake Travis ISD |

$ Checks and drafts are accepted subject to col-
lection and full credit will only be given when the
check or draft has been accepted by the financial
institution on which it was drawn.

| DATE | 3 5 20 07 | Cash | Check | M.O. | Credit | DEPUTY CLERK |
|---|---|---|---|---|---|---|